**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BLUE GOOSE SUPER MARKET, INC.,** ) <br> **on behalf of itself and** ) <br> **all others similarly situated,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **vs.** ) <br> ) <br> **C&S Wholesale Grocers, Inc., and** ) <br> **SUPERVALU, Inc.,** ) <br> ) <br> **Defendants.** ) | **Judge:** _____ <br><br> **Magistrate:** _____ <br><br> **Case No.:** _____ <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, BLUE GOOSE SUPER MARKET, INC., (hereinafter "Blue Goose" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this action under the antitrust laws of the United States, specifically §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), for treble damages, injunctive relief, and the costs of suit, including reasonable attorneys' fees, for the injuries to the Plaintiff and members of the Class it represents resulting from Defendants' *Per Se* violations of Section 1 of the Sherman Act (15 U.S.C. § 1). The allegations set forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding the Plaintiff.

## INTRODUCTION

1.     Plaintiff, Blue Goose, pursuant to federal antitrust laws, brings this Class Action Complaint for damages directly and proximately caused by Defendants' conspiracy to allocate markets, customers and territories and to commit other anticompetitive acts for the purpose and effect of unlawfully fixing, raising, and maintaining prices of wholesale grocery products sold in

the New England and Midwest regions of the United States. Defendants unlawful activities constitute a *Per Se* violation of Section 1 of the Sherman Act 15 U.S.C. §1.

2.      C&S Wholesale Grocers, Inc., ("C&S") and SUPERVALU, Inc., ("Supervalu") are the largest suppliers of wholesale grocery products in the United States with combined annual wholesale revenues in excess of twenty-eight billion dollars ($28,000,000,000.00). C&S and Supervalu purchase consumer goods products from manufacturers and then resell the products (and related services) to grocery retailers.

3.      Until 2003, C&S and Supervalu competed aggressively against one another in the six-state New England market, where C&S's wholesale business was based. In 2003, C&S began implementing a plan to enter states in the Midwest, an area dominated by Supervalu. Rather than extend their competition to the Midwest or continue to compete in New England, Defendants reached an agreement to allocate territories and customers, whereby Supervalu agreed to exit the New England market in return for C&S's agreement not to compete in the Midwest region. This agreement has caused substantial harm to members of the Class. Prices and margins for wholesale grocery products have been inflated in New England and the Midwest and the supply of wholesale grocery products has been reduced.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and pursuant to 28 U.S.C. §§ 1331, 1337(a).

5.      Venue is proper in this district pursuant to Section 22 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b) and (c). Some or all Defendants reside, are licensed to do business, are doing business, have agents, or are found or transact business, in this District and/or the claims arose in this District.

2

6.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, or did have, a substantial effect on the interstate commerce of the United States.

## PARTIES

7.     Plaintiff, BLUE GOOSE SUPER MARKET, INC., an Illinois corporation with its principal place of business at 300 South 2nd Street, Saint Charles, Illinois, purchased wholesale grocery products directly from one or more of the Defendants during the Class Period, and was damaged as a result of Defendants' unlawful conduct.

8.     Defendant, C&S Wholesale Grocers, Inc., (hereinafter "C&S"), is a Vermont corporation with its principal place of business in Keene, New Hampshire. C&S sells wholesale grocery products with revenues in 2007 that exceeded nineteen billion dollars ($19,000,000,000.00). C&S is the largest grocery wholesaler in the United States, supplying thousands of retailers from distribution centers in twelve (12) states. C&S is the dominant wholesale grocer in the six-state New England area (as defined herein), accounting for the vast majority of wholesale sales to retail grocers.

9.     Defendant, SUPERVALU Inc., (hereinafter "Supervalu"), is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Supervalu sells wholesale grocery products and services with revenues in 2007 that exceeded nine billion dollars ($9,000,000.00). Supervalu is the second largest grocery wholesaler in the United States, supplying thousands of retailers from distribution centers in twenty-one (21) states. Supervalu is the dominant wholesale grocer in the seven-state Midwest area (as defined herein), accounting for the vast majority of wholesale sales to retail grocers.

3

## DEFINITIONS

10.     As used herein, the term "New England" means the States of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

11.     As used herein, the term "Midwest" means the States of Illinois, Indiana, Iowa, Michigan, Minnesota, Ohio and Wisconsin.

12.     As used herein, the term "wholesale grocery products" means products sold at retail food stores and supermarkets including, but not limited to, produce, meat, dairy products, deli items, bakery items, paper products, household products, health and beauty aids and candy.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and a Class consisting of:

> *All persons (excluding federal, state and local governmental entities and political subdivisions and Defendants, their respective parents, subsidiaries and affiliates) who purchased wholesale grocery products within the (a) six state region of New England and (b) the Midwest (Iowa, Minnesota, Ohio, Michigan, Illinois and Indiana), directly from any of the Defendants or their co-conspirators during the period from September 8, 2003 through the date of the filing of the Complaint and who have sustained damages thereby.*

14.     Plaintiff does not know the exact size of the Class since such information is exclusively in the control of the Defendants. However, due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed throughout New England and the Midwest so that joinder of all Class members is impracticable.

15.     Plaintiff's claim is typical of the claims of all Class members in that Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants and their co-

4

conspirators as alleged in this Complaint.

16.     Plaintiff, as representative of the Class, will fairly and adequately protect the interests of the Class members. The interests of Plaintiff coincide with, and are not antagonistic to those of the Class members. In addition, Plaintiff is represented by counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

17.     Except as to the amount of damages each Class Member has by itself sustained, all other questions of law and fact are common to the Class Members and predominate over any questions that may affect only individual members. Common questions of law and fact include:

(a)     Whether Defendants and their co-conspirators engaged in a conspiracy to raise, fix or maintain prices on wholesale grocery products through territorial and customer allocation;

(b)     Whether Defendants and their co-conspirators sold wholesale grocery products to Plaintiff and Class members at artificially inflated prices;

(c)     The duration and extent of the conspiracy alleged in this Complaint;

(d)     Whether Defendants and their co-conspirators participated in the combination or conspiracy alleged in this Complaint;

(e)     Whether Defendants and their co-conspirators fraudulently concealed their conspiracy from Plaintiff and Class Members;

(f)     Whether the alleged conspiracy caused injury to the business or property of Plaintiff and Class Members; and

(g)     The appropriate measure of damages by which the conduct of Defendants and their co-conspirators injured Plaintiff and Class Members.

18.     A Class Action is superior to any other available methods for the fair and efficient adjudication of the controversy alleged in this Complaint, in that there is no interest by Class Members in individually controlling the prosecution of separate actions; and it is desirable to concentrate the litigation of the claims made herein in a single proceeding in order to provide

small claimants with a forum in which to seek redress for these antitrust violations. Whatever difficulties may exist in the management of the Class Action will be greatly outweighed by the Class Action procedure, including but not limited to providing claimants with a method for the redress of claims which may not otherwise warrant individual litigation.

## TRADE AND COMMERCE

19.     During all or part of the class period, Defendants were the two largest wholesalers of grocery products in the United States. Their activities, as described herein, were within the flow of, and substantially affected, interstate commerce.

20.     Defendants sold wholesale grocery products throughout the United States in interstate commerce, and have used the instrumentalities of interstate commerce to sell and market their products.

## INDUSTRY BACKGROUND

21.     Grocery wholesalers purchase products directly from manufacturers, store the products in distribution facilities, and then resell the products and related services to food retailers like Blue Goose. Some wholesalers, including C&S and Supervalu, specialize in purchasing a broad array or "full line" of grocery products from manufacturers and resell the products and related services to grocery retailers. Full line grocery wholesalers stock tens of thousands of different products, including produce, meat, dairy products, deli products, bakery items, health and beauty aids and candy.

22.     Large grocery wholesalers that serve a broad geographic area typically offer a full line of grocery products and services to retailers and typically operate several distribution facilities to serve retailers within the area.

23.     Distribution facilities are a key to the wholesale grocery business. Due to thin

6

margins, grocery retailers cannot afford to do business with wholesalers who do not have warehousing in their general area. Moreover, because the cost of customer delivery is high the wholesaler's ability to compete is geographically limited to the area reasonably accessible to his warehouse facilities.

### Supervalu

24.     Supervalu's grocery wholesale business grew substantially in the 1990s and early 2000s.

25.     Supervalu entered new geographic territories outside its traditional base of operations in the Midwest through the acquisition of existing wholesalers. For example, in 1994, Supervalu entered the New England market by acquiring Sweet Life Foods, Inc., a grocery wholesaler that served hundreds of retailers in New England through its warehouse facilities in Portland, Maine, Andover, Massachusetts, and Cranston, Rhode Island. Following this acquisition, Supervalu competed aggressively in New England, an area that had been dominated by C&S.

26.     After entering the New England market, Supervalu took accounts and market share from C&S and grew its New England-based wholesale business. By 2003, Supervalu had achieved sales of roughly $1.5 billion in New England. While C&S remained the market leader in New England, price competition from Supervalu was fierce and benefited retailers in the form of lower prices and improved services.

27.     In an effort to improve its profits, Supervalu implemented a new pricing program referred to as Activity Based Sell ("ABS"). In a 10-K filed with the SEC, Supervalu stated that under ABS, it would charge retailers Supervalu's "net product price" (i.e, the price it paid manufacturers for product net of discounts) plus fees that would enable Supervalu to "earn an

7

adequate profit margin."

> *The Company has reexamined its pricing, structure and has developed a new pricing approach to retailers called Activity Based Sell ("ABS"). The primary objectives of ABS are to reflect the net product price plus fees to recover the Company s cost to serve the retailer and to earn an adequate profit margin.*

Supervalu's 1998 10-K.

28.     In the late 1990s, Supervalu began implementing its new pricing program, starting in Midwestern states where Supervalu was the dominant grocery wholesaler. Retailers in Midwestern states immediately felt the effects of ABS, as Supervalu's prices increased substantially.

29.     Following its price increase in the Midwest, Supervalu implemented ABS in its other territories - except in New England, where the ABS pricing was too high for Supervalu to compete effectively with C&S.  Retailers would have left Supervalu for C&S, rendering the price increase unprofitable. Unlike in the Midwest, competition between C&S and Supervalu prevented Supervalu's price increase.

## C&S

30.     In the early 2000s, C&S was looking to expand the geographic territories in which it competed. C&S's business was concentrated primarily in the Northeast and the wholesaler sought growth opportunities in other geographic locations. In 2003, Fleming - a major full-line grocery wholesaler with operations in many parts of the United States - filed for bankruptcy and sought to sell its wholesale operations, including its operations in the Midwest. Fleming operated three Midwestern distribution facilities. Fleming used these distribution facilities to serve hundreds of retailers in Midwest states. Purchasing Fleming's operations provided C&S an efficient means for entering the Midwest market, as these distribution facilities could serve

8

retailers throughout Midwestern states.

31.     In late June, 2003 - roughly three months after Fleming filed for bankruptcy - C&S announced that it would purchase Fleming's assets. Fleming's assets allowed C&S to expand its wholesale business into the Midwest:

> *The purchase of Fleming's wholesale grocery operations would allow us to expand our business into parts of the country where we do not presently operate. We are excited about working with Fleming and its chain and independent supermarket customers in a mutually beneficial transition for all parties.*

32.     In order to retain the business of Fleming's retailers, C&S agreed to immediately supply Fleming with consumer goods products so that Fleming had a sufficient inventory to continue supplying retailers pending the completion of the sale. C&S also began meeting with retailers to secure the retailers' business by promising to offer wholesale goods and services at low prices. As part of its entry into the Midwest, C&S met with Fleming employees working the Fleming Midwestern distribution facilities to discuss the employees transitioning to C&S to service retailers that purchased product from C&S. Using the Fleming distribution facilities in Wisconsin to enter the region, competition between C&S and Supervalu in the Midwest had commenced.

33.     Considering the intense price competition between the two wholesalers in New England, the prospect of C&S expanding into Midwestern states, where Supervalu's ABS pricing prevailed was a substantial threat to Supervalu. When C&S announced that it would acquire Fleming's assets, Supervalu's stock declined ten percent on the news that a "stronger rival" was to acquire "an immediate stronghold in certain Midwest states, key areas for Supervalu."

34.     Faced with the prospect competing against C&S in the Midwestern states,

9

Supervalu had one of two options: either vigorously compete, which would have substantially reduced the prices to retailers, or collude with C&S to eliminate competition between the wholesalers.

35.     Attempting to strike a competition-limiting arrangement with a competing wholesaler was not a novel concept to Supervalu. At the very same time that C&S sought to enter the Midwest, Supervalu was negotiating an arrangement with Associated Grocer, Inc., a wholesaler that competed against Supervalu in the Pacific Northwest. Negotiations between Supervalu and Associated Grocers abruptly ended when – contrary to the spirit of the parties' proposed arrangement – Associated Grocers won a contract to supply Supervalu's largest retailer in the Pacific Northwest by proposing prices to the retailer that were six million dollars ($6,000,000.00) a year less than Supervalu's prices.

36.     Supervalu subsequently sued Associated Grocers, claiming that Associated Grocers could not simultaneously compete while negotiating a competition-limiting arrangement with Supervalu. Associated Grocers responded that Supervalu's position, if accepted, would violate the antitrust laws. The Court agreed and held that any agreement not to compete between the wholesalers would be a *per se* violation of the antitrust laws:

> *An agreement to notify one another of any intent to compete for each other's customers or to refrain from such competition altogether would have been a per se violation of the Sherman Act. See United States v. Topco Assocs., Inc., 405 U.S. 596, 612 (1972) (holding that territorial and customer allocation scheme among Sellers of private label groceries violated antitrust laws).*

37.     In an effort to conceal the anticompetitive nature of its dispute with Associated Grocers, Supervalu litigated its entire suit against Associated Grocers under seal.

38.     While Supervalu's efforts to eliminate Associated Grocers as a competitive threat were unsuccessful, Supervalu would find a more receptive partner to a *per se* illegal arrangement in C&S. Shortly after C&S began its efforts to enter the Midwest, Supervalu and C&S started negotiating an arrangement that would limit, if not end, competition between them.

39.     In August 2003, Supervalu and C&S entered into an Agreement to refrain from competing against one another by allocating markets and customers. They agreed that Supervalu would exit New England in return for C&S's agreement not to enter the Midwest. Supervalu's New England retailers would be transferred to C&S, and C&S's Midwest retailers (i.e. the retailers previously served by Fleming) would be transferred to Supervalu.

40.     As a result, C&S would no longer face the fierce competition from Supervalu in New England, and Supervalu would ensure that the price competition it had faced in New England would not occur in Midwest states, where Supervalu's ABS pricing prevailed. Further C&S was free to price its products to retail grocers in a non-competitive manner which it began to do at least as early as 2005. Traditionally, C&S charged on the basis of its "cost" - plus an "up charge." In 2005, as a result of its agreement with Supervalu, C&S was able to increase the "up charge" to its customers, without the fear of losing customers. In 2007, C&S again increased its "up charge" by separating out a fuel component, although fuel had always been part of the "up charge." The fuel surcharge was much greater than the actual cost of the increase in fuel. Even after fuel prices had come back down, the charge was converted into a "delivery charge" that was far in excess of the actual cost for making such deliveries.

41.     Supervalu and C&S concealed the nature of their Agreement by publicly referring to it as an "asset swap." However, rather than swapping assets to facilitate competition, C&S immediately closed the three Midwest distribution facilities that C&S had purchased from

Fleming and terminated over one thousand (1,000) employees. In addition, shortly after the Agreement was consummated, C&S closed the three New England distribution facilities owned previously by Supervalu and terminated over one thousand (1,000) employees.

42.    Simply, Supervalu and C&S traded retail accounts, thereby eliminating competition between themselves, and reducing substantially the supply of wholesale goods and services in New England and the Midwest by closing distribution facilities that had served retailers for years, which enabled them to raise prices substantially in New England and the Midwest.

**Results of the Supervalu/C&S Market and Customer Allocation**

43.    As a result of their Agreement, Supervalu ensured the continuation of ABS pricing in the Midwest rather than run the risk of facing the aggressive price competition from C&S, while C&S no longer faced price competition in New England from Supervalu, allowing it to raise prices.

44.    The territorial and customer allocation reduced the supply of grocery wholesale goods and services in New England and the Midwest. Reducing the supply of grocery wholesale goods and services to retailers helped Supervalu and C&S raise and maintain higher prices and perpetuate their dominance in New England and the Midwest.

45.    Even after Supervalu acquired the operations of Shaw's Markets and Star Markets, one of the largest grocery chains in New England, through its purchase of Albertson in 2007, Supervalu did not re-enter the wholesale grocery market in New England. As part of the Shaw's/Star acquisition, Supervalu obtained several distribution facilities. Supervalu uses these facilities to serve Shaw's/Star and does not use the facilities for wholesale operations. C&S continues to serve as the wholesale distributor for much of the Shaw's/Star system, now owned

by Supervalu.

46.     The running of any statute of limitations has been suspended with respect to any claims which Plaintiff and members of the class or subclasses have sustained as a result of the unlawful contracts, combinations and/or conspiracies alleged herein, and with respect to their rights to injunctive relief by virtue of the federal doctrine of fraudulent concealment. Defendants through various devices and techniques of secrecy affirmatively and fraudulently concealed the existence of the unlawful contracts, combinations and/or conspiracies alleged herein.

47.     Both Supervalu and C&S took steps to fraudulently conceal the anticompetitive nature and effects of their market and customer allocation by concealing anticompetitive terms of the agreement memorializing their market and customer allocation – including the Defendants' non-compete provisions – and Supervalu concealing its dispute with Associated Grocers (which is relevant to Supervalu's anticompetitive intent in negotiating arrangements with competitors).

48.     Defendants represented publicly, both to customers and otherwise, that their pricing activities and business strategies were unilateral, rather than collusive, and based upon legitimate business purposes. In making those false representations, Defendants mislead Plaintiff and members of the class or subclasses as to the true, collusive, and coordinated nature of their market and customer allocation and other anticompetitive activities.

49.     At the time Supervalu and C&S entered their market and customer allocation agreement, they had market power as reflected by their (a) combined market share which was significantly greater than seventy percent (70%) in the Midwest and New England; (b) ability to reduce the supply of grocery wholesale goods and services in the Midwest and New England; and (c) ability to raise prices in the Midwest and New England above competitive levels.

50.     Since entering the market and customer allocation agreement, C&S has had

market power in New England as reflected by its (a) market share, which, upo information and belief, has significantly exceeded seventy percent (70%); (b) ability to reduce the supply of grocery wholesale goods and services in New England; and (c) ability to raise prices in New England above competitive levels.

51.     Since entering the market and customer allocation agreement, Supervalu has had market power in the Midwest as reflected by its (a) market share, which, upon information and belief, has exceeded seventy percent (70%); (b) ability to reduce the supply of grocery wholesale goods and services in the Midwest, and (c) ability to raise prices in the Midwest above competitive levels.

52.     Entry barriers exist in the full-line grocery wholesale goods and services market(s) or submarkets. Entry requires substantial investments in resources and time to build distribution facilities and services (including transportation services), hire and train employees, and invest time and effort in securing retail accounts, including accounts subject to long-term exclusive contracts.

53.     Because of these barriers to entry, many full line grocery wholesalers in the United States, including C&S and Supervalu, have expanded into new territories by acquiring other wholesalers, which requires substantial resources. Since the 1990s, the grocery wholesale industry has experienced substantial consolidation and limited opportunities currently exist for substantial expansion through acquisition. By closing the distribution facilities in the Midwest and New England Supervalu and C&S have increased barriers to entry into those territories.

## VIOLA TIONS ALLEGED

54.     Beginning as early as September 8, 2003, and continuing thereafter until at least the date of the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants

and their co-conspirators have engaged in a combination or conspiracy in restraint of trade to raise, fix, maintain or stabilize prices on wholesale grocery products and services in New England and the Midwest through market and customer allocation in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

55.     The aforesaid combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain or stabilize prices on wholesale grocery products and services in New England and the Midwest.

56.     For the purposes of formulating and effecting the aforesaid combination and conspiracy, the Defendants and their co-conspirators did those things which, as hereinbefore alleged, they combined and conspired to do.

**EFFECTS**

57.     The aforesaid combination and conspiracy has had the following effects, among others:

(a)     Price competition in the sale of wholesale grocery products within New England and the Midwest has been suppressed and restrained;

(b)     Prices of wholesale grocery products purchased by Plaintiff and other Class members have been fixed, raised, maintained, or stabilized at artificial and noncompetitive levels;

(c)     Suppliers of wholesale grocery products have been reduced in New England and the Midwest; and

(d)     Purchasers of wholesale grocery products and services within New England and the Midwest have been deprived of the benefit of free and open competition in the sale of those products and services.

**FRAUDULENT CONCEALMENT**

58.     Plaintiff and Class members had no knowledge of this conspiracy, or of any fact

15

that might have led to the discovery of it, until shortly before the filing of this complaint.

59.     Defendants engaged in a successful, illegal conspiracy that, by its nature, was inherently self-concealing.

60.     Plaintiff and the Class members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications between the Defendants by the use of the telephone or in-person meetings.

61.     For example, in March 2004, C&S closed the distribution centers it had acquired in the "asset swap." A spokesperson described the decision to close one of the centers as being based on business necessity and that it "did not plan to close the plant when it acquired it last fall" - which was not true and was intended to, and did, help to conceal Defendants' anticompetitive Agreement.

62.     By virtue of the fraudulent concealment by Defendants and their co-conspirators the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the other Class members have as a result of the unlawful contract, conspiracy or combination alleged in this Complaint.

## DAMAGES

63.     During and throughout the period of the antitrust violations by Defendants and their co-conspirators, Plaintiff and each member of the Class it represents purchased wholesale

16

grocery products from one or more of the Defendants or their co-conspirators and, by reason of the antitrust violations alleged, paid more for the wholesale grocery products that they purchased than they would have paid under conditions of free and open competition. As a result of the illegal conspiracy, Plaintiff and each member of the Class it represents has been injured and damaged in an amount presently undetermined.

## CAUSES OF ACTION
## COUNT I
## Conspiracy to Restrain Trade in Violation of Sherman Act Section 1
## (Supervalu and C&S – *Per Se* Unlawful and Rule of Reason)

64.     Plaintiff repeats and realleges each and every preceding paragraph as though fully set forth herein.

65.     Defendants have entered contracts, combinations and/or conspiracies in restraint of trade and commerce, the purpose and effect of which is to allocate markets and customers for grocery wholesale goods and services. The contracts, combinations and/or conspiracies consisted of continuing agreements, understandings, and a concert of action among Defendants. The contracts, combinations and/or conspiracies are illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

66.     These contracts, combinations and/or conspiracies have caused substantial anticompetitive effects in the market(s) or submarkets for full line grocery wholesale goods and services, including, but not limited to, higher prices, reduced capacity, and reduced competition for grocery wholesale goods and services.

67.     Defendants' contracts, combinations and/or conspiracies have no legitimate business purpose. They achieve no legitimate efficiency or procompetitive benefit to

17

counterbalance the substantial anticompetitive effects that they have caused in the market(s) or submarkets for full line grocery wholesale goods or services.

68.     Throughout the relevant time period, Defendants, individually and collectively, possessed market power in the market(s) or submarkets for full line grocery wholesale goods and services in the Midwest and New England.

69.     Defendants' contracts, combinations and/or conspiracies constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason.

70.     Defendants' conduct substantially and adversely affects interstate commerce in the market(s) or submarkets for full line grocery wholesale goods and services.

71.     As a direct and proximate result of Defendants' violations of the Sherman Act, Plaintiff and each class or subclass member has been damaged (i) in their business or property by paying charges for grocery wholesale goods and services to Defendant that were higher than they would have been but for Defendants' unlawful agreements; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. §15(a).

## JURY DEMAND

72.     Pursuant to Fed.R.Civ.P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands as follows:

(A)     That the Court determines that this action may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure;

(B)     That the alleged conspiracy among Defendants and their co-conspirators be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15

18

U.S.C. §1;

(C)     That judgment be entered for Plaintiff against Defendants, jointly and severally, and in favor of Plaintiff and each member of the Class it represents, for three times the amount of damages determined to have been sustained by Plaintiff and each member of the Class it represents, together with the cost of this action, including a reasonable attorneys' fee;

(D)     That each of the Defendants, their affiliates, successors, transferees, assigns, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from, in any manner directly or indirectly, continuing, maintaining or renewing the combination or conspiracy alleged herein, or from engaging in any other combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(E)     Such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: September 22, 2009                    Respectfully submitted,

                                             By: /s/ Robert M. Foote
                                                 Robert M. Foote, Esq.

                                                 Robert M. Foote, Esq. (#03124325)
                                                 Matthew J. Herman, Esq. (#06237297)
                                                 FOOTE, MEYERS, MIELKE & FLOWERS, LLC
                                                 3 North Second Street
                                                 Suite 300
                                                 St. Charles, Illinois 60174
                                                 Telephone: (630) 232-6333
                                                 Facsimile (630) 845-8982

19

Kathleen C. Chavez, Esq. (#06255735)
Chavez Law Firm, P.C.
3 North Second Street
Suite 300
St. Charles, Illinois 60174
Telephone: (630) 232-4480
Facsimile: (630) 845-8982

Peter L. Currie, Esq. (#06281711)
The Law Firm of Peter L. Currie, P.C.
536 Wing Lane
St. Charles, Illinois 60174
Telephone: (630) 862-1130

***Attorneys for Plaintiff***